## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SARA R. REEDY** | ) | |
| | ) | |
| Plaintiff**,** | ) | |
| | ) | |
| v. | ) | **2:06cv1080** |
| | ) | **Electronic Filing** |
| | ) | |
| **FRANK S. EVANSON,** indvidiaully and in | ) | **Judge David S. Cercone** |
| and in his official capacity as a Police Officer | ) | |
| of the Township of Cranberry**; STEVE** | ) | |
| **MANNELL,** individually and in his official | ) | |
| capacity as the Public Safety Director of the | ) | |
| Township of Cranberry**; KEVIN MEYER,** | ) | |
| individually and in his official capacity as a | ) | |
| Police Officer of the Township of Cranberry, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION

## I.    INTRODUCTION

Sarah R. Reedy ("Plaintiff" or "Reedy") commenced this civil rights action pursuant to 42 U.S.C. § 1983 seeking redress for claims of unlawful search, unlawful seizure, false imprisonment, and malicious prosecution under the Fourth Amendment and violation of liberty interests under the Due Process Clause of the Fourteenth Amendment of the United States Constitution, and false arrest, false imprisonment, abuse of process and intentional infliction of emotional distress under Pennsylvania Law.  Detective Frank S. Evanson ("Detective Evanson"), Detective Kevin Meyer ("Detective Meyer"), and Public Safety Director Steve Mannell's (collectively "Defendants") filed a Motion for Summary Judgment.  After careful consideration of the parties' submissions and the applicable law, this court issued an order granting defendants' motion on March 31, 2009.  This opinion is issued in support of that order.

## II.  SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any

material fact and that the movant is entitled to judgment as a matter of law." Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's claim, and upon which that party will bear the burden of proof at trial. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence which demonstrates the absence of a genuine issue of material fact. When the movant does not bear the burden of proof on the claim, the movant's initial burden may be met by demonstrating the lack of record evidence to support the opponent's claim. <u>National State Bank v. National Reserve Bank</u>, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a <u>genuine issue for trial</u>," or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. <u>Matsushita Electric Industrial Corp. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986) (<u>quoting</u> Fed.R.Civ.P. 56 (a), (e)) (emphasis in <u>Matsushita</u>). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986).

In meeting its burden of proof, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita</u>, 475 U.S. at 586. The non-moving party "must present affirmative evidence in order to defeat a properly supported motion" and cannot "simply reassert factually unsupported allegations." <u>Williams v. Borough of West Chester</u>, 891 F.2d 458, 460 (3d Cir. 1989). Nor can the opponent "merely rely upon conclusory allegations in [its] pleadings or in memoranda and briefs." <u>Harter v. GAF Corp.</u>, 967 F.2d 846 (3d Cir. 1992). Likewise, mere conjecture or speculation by the party resisting summary judgment will not provide a basis upon which to deny the motion. <u>Robertson v. Allied Signal, Inc.</u>, 914 F.2d 360, 382-83 n.12 (3d Cir. 1990). If the non-moving party's evidence merely is colorable or lacks sufficient probative force summary judgment must be granted. <u>Anderson</u>, 477 U.S. at 249-50; <u>see</u> <u>also</u> <u>Big Apple BMW, Inc. v. BMW of North America</u>, 974 F.2d 1358, 1362 (3d Cir. 1992), <u>cert.</u> <u>denied</u>, 113 S.Ct. 1262 (1993) (although the court is not permitted to weigh facts or competing inferences, it is no longer required to "turn a blind eye" to the weight of the evidence).

## III.   FACTUAL BACKGROUND

Unless otherwise specified, the following facts are undisputed.  Defendant Evanson has been a police detective for the Cranberry Township Police Department since 1986.  (Defendants' Concise Statement of Material Facts, doc. no. 99 at ¶ 1; Plaintiff's Responsive Concise Statement to Defendant's Concise Statement of Material Facts, doc. no. 104 at ¶ 1).  On July 14, 2004, Detective Evanson was notified by Corporal Hartman of the Cranberry Township Police Department of a robbery and sexual assault at the J&G Gulf Station in which Plaintiff was the victim.  (doc. no. 99 at ¶ 3).  In January, 2005, Detective Evanson prepared and filed a Criminal Complaint and Affidavit of Probable Cause ("Affidavit") with District Justice Steffe for the purpose of charging Plaintiff with the misdemeanor crimes of theft, receiving stolen property, and making false reports to law enforcement authorities.  (doc. no. 99 at ¶ 7; doc. no. 104 at ¶ 7).  District Justice Steffe issued a warrant for Plaintiff's arrest.  (doc. no. 99 at ¶ 7).  What follows is a chronological account of the events from the robbery and sexual assault up to the point the charges against Plaintiff were dropped.[1]

### A.   The Incident

Immediately following the robbery and assault, Plaintiff made her way to Jordan's Service Center and informed the employee on duty, Robert McGee, that she had been robbed.  (doc. 99 at ¶ 10; doc. 104 at ¶ 10).  McGee placed a 911 call to report the incident, and while on the phone, Plaintiff stated that she had also been sexually assaulted.  (doc. 99 at ¶ 12; doc. no. 104 at ¶ 12).  The actor was described as a male, approximately 5'6" to 5'7" tall, wearing a blue baseball cap, blue jeans, and blue boxers.  (doc. no. 99 at ¶ 13; doc. no. 104 at ¶ 13).  Plaintiff did not know which direction the actor left the scene or have any vehicle description.  (doc. no. 99 at ¶ 14; doc. 104 at ¶ 14).  Plaintiff's boyfriend, Mark Watt, arrived on the scene after being called by Plaintiff, and Corporal Charles M. Mascellino transported both Plaintiff and Mark Watt to the University of Pittsburgh Medical Center ("UPMC") Cranberry.  (doc. 99 at ¶ 14; doc. no. 104 ¶

---

[1]This account will also include the contents of Detective Evanson's Affidavit of Probable Cause (doc. 98, exh. 3) as Defendants' Concise Statement of Material Facts details all forty-seven (47) sentences of the Affidavit (*See* doc. 99 at ¶¶ 9-55).

14). While at the hospital, Plaintiff reported the details of the robbery and sexual assault to Corporal Mascellino, who then entered into the Police Report a detailed recitation of Plaintiff's description:

> At the ER, RO [Mascellino] and Reedy were seated in the triage area while awaiting Det. Evanson. RO asked Reedy about the incident and to say what happened. Reedy stated that she was reading the newspaper when a male walked in. She stated that she didn't pay much attention to him. She stated that he went and picked up a pack of gum, then went over to the register. Reedy then stated that he pulled a black gun from the front of his waistband and ordered her to get on the floor. The male then walked around the counter and asked her how to open the register. She told him to push the No Sale key. Male couldn't find the key, and she told him she thought it was blue and had a "NS" on it. The male then opened the register and took the money out of the register. RO asked if she knew how much was in the register. Reedy stated that there was $75.00 in $5's, about $80.00 in $10's, some $20's, and she was unsure how many $1's. Reedy said the male then unzipped his pants and took out his "dick." She stated that he told her to "suck his cock" and that she didn't want to die so she did. He then told her to stick her finger up his "asshole" and she did. The male told her he was going to come, and that she would swallow it or he would shoot her in the head. She stated again that she did not want to die so she did. She also stated that he was playing with her breasts. When RO asked where this happened, Reedy stated that it was in front of the windows so everyone could see. Reedy stated that the male told her to go into the back room, which she did. The male told her to open the safe, which she did. He then told her to take out the money. She stated that she took two envelopes out of the safe. One envelope contained $75.00 in $1.00 bills. The other envelope was a blue envelope marked lottery, and she was not sure how much was in it. She said the male then told her to rip the phone lines from the wall and she did. He then told her to stay there for 5 minutes or he would shoot her. She stated that she waited there for a while, then ran out the back door over to Jordan's.

(doc. no. 104 at ¶¶ 61-63; Defendants' Response to Plaintiff's Additional Material Facts, doc. no. 107 at ¶¶ 61-63).[2]

Upon Detective Evanson's arrival at UPMC Cranberry, he and Corporal Mascellino entered the room where Plaintiff was being treated and she again advised the officers of the

---

[2] Corporal Mascellino's report appears in other parts of the record.

incident.  (doc. no. 99 at ¶¶ 16-26; doc. no. 104 at ¶¶ 16-26).[3]  She further advised the officers that the incident occurred at approximately 10:40 P.M.  (doc. no. 99 at ¶ 28; doc. no. 104 at ¶ 28).  Prior to being released from UPMC Cranberry, Plaintiff agreed to provide Detective Evanson with a written statement.  (doc. no. 99 at ¶ 29; doc. no. 104 at ¶ 29).

Nurse Mary Beth Farah treated Plaintiff on the night of the incident, and provided a written statement to Detective Evanson which included information that Plaintiff conveyed about the incident.  (doc. 104 at ¶¶ 80-81; doc. no. 107 at ¶¶ 80-81).  Nurse Farah's narrative quoted Plaintiff as saying "[t]hey're calling me a liar."  (doc. no. 104 at ¶ 82; doc. no. 107 at ¶ 82).  The narrative also included another detailed account  from Plaintiff describing the incident.  (doc. no. 104 at ¶ 83).[4]

## B.     The Panic Alarm and the "No Sale" Key

J&G Gulf manager Carol Hazlett was at the store on July 14, 2004 for a period of time,

---

[3] Plaintiff's description of the actor's age is in dispute.  In the Affidavit of Probable Cause, the actor is described as between 28 and 31 years of age.  Plaintiff contends she advised the officers that the male was from his mid-30's to early 40's.  (doc. no. 99 at ¶ 18; doc. no. 104 at ¶ 19).

[4] Nurse Farah's Narrative includes the following:

Pt reports while working as a cashier at Gulf Station unk man 5'6" - 5'7" caucasian approx 150lbs with brown hair, baseball cap wearing blue jeans grey T shirt and brown work boots age mid 30's-40's entered store held handgun to left side of her head and made her take money out of cash register then told her to remove her shit and stated "suck my dick and if you bite me I'll hurt you."  Assailant then had oral intercourse while next to cash register ejaculating in pt's mouth and instructed her to swallow it which she did.  Pt reports no semen got on her face & Pt states she was then told to go into the back office and rip phone cords out.  Pit states he then fondled her breasts using hands.  No licking scratching or biting done no marks noted on chest.  He then instructed pt to insert her finger into his rectum pt states she used her left index finger.  He then told her not to move for 5 minutes.  During this five minutes she states she gargled with water twice and washed her hands with soap and water.  Pt states she then went across the street to Denny Jordans to call for help pt presents wearing same clothing at time of assault - shirt & pants collected pt not wearing a bra.

(doc. no. 104 at ¶ 83).

but went home prior to the incident. (doc. no. 99 at ¶¶ 31-32; doc. no. 104 ¶¶ 31-32). At approximately 11:20 P.M., the station's alarm company, Security Systems of America, contacted Ms. Hazlett to report an interruption to the power source of the alarm and that it failed to restore after a one-hour delay. (doc. no. 99 at ¶ 33; doc. no. 104 at ¶ 33). The alarm company contacted Ms. Hazlett after it attempted to call the J&G Gulf Station and received no answer. (doc. no. 99 at ¶ 34; doc. no. 104 at ¶ 34). Upon arriving at the station, Ms. Hazlett checked the power cord for the alarm, located behind the desk in the rear office, and discovered that it had been unplugged. (doc. no. 99 at ¶ 36; doc. no. 104 at ¶ 36). Plaintiff denies pulling the plug or even knowing where it was located prior to the incident. (Reedy Depo. at 113-14). No other explanation as to how the alarm plug was pulled has been proffered by either party. (*Id.*; Evanson Depo. at 215-16).

Ms. Hazlett also pulled the register take for the night of July 14, 2004 and found that the NS ("No Sale") key had been pushed at 9:40 P.M. (doc. no. 99 at ¶ 37; doc. no. 104 at ¶ 37). The register's time was one hour behind actual time, meaning that the NS key was pushed at 10:40 P.M. (*Id.*). Ms. Hazlett confirmed that the clock in the station is not in sync with the register clock. (doc. no. 99 at ¶ 38; doc. no. 104 at ¶ 38).

### C. Plaintiff's Meeting with Detective Evanson

At some point following the incident, Plaintiff, accompanied by her parents, met with Detective Evanson at the Cranberry Township Police Station to discuss the incident and provide a written statement.[5] At this meeting, Detective Evanson asked Plaintiff about the alarm plug, and she stated that while in the rear office with the actor, she only disabled the telephone and she did not believe the actor disabled any lines for electricity or the alarm. (doc. no. 99 at ¶¶ 41-43; doc. no. 104 at ¶¶ 41-43). Detective Evanson advised Plaintiff that a report from Security

---

[5]Detective Evanson wrote in the Affidavit of Probable Cause that Plaintiff came to the police station on July 23, 2004. (doc. no. 99 at ¶ 40). Plaintiff states that she, her mother, and her step-father met with Detective Evanson on July 16, 2004, the day after her release from UPMC Cranberry. (doc. no. 104 at ¶ 40). Regardless, at some point shortly after her release from the hospital, Plaintiff met with Detective Evanson to discuss the incident and provide a written statement.

Systems of America confirmed that an alarm was signaled at 2314 hours because of a power failure at 2214 hours. (doc. no. 98, exh. F; doc. no. 99 at ¶ 44). He then questioned Plaintiff as to how this power failure could have occurred at 2214 hours when the incident occurred at 2240 hours. (doc. no. 99 at ¶ 47).

In response to this line of questioning, Plaintiff became upset and said she wanted to "drop the whole thing." (*Id.*). In the Affidavit, Detective Evanson characterized Plaintiff as being "verbally abusive," but Plaintiff claims she was only upset because Detective Evanson grew "hostile" towards her and accused her of lying and taking money from the Gulf Station. (*Id.* at ¶ 47; doc. no. 104 at ¶ 47, ex. 6, Reedy Depo., at 88:11-20, 93:12-94:19, 111:8-25). Detective Evanson informed Plaintiff that the matter could not be dropped due to the alleged robbery and theft, at which time Plaintiff grew more agitated and stated she just wanted "the whole thing to go away." (doc. no. 99 at ¶ 48). Plaintiff claims that she grew more agitated and indicated a desire to stop the proceedings in response to Detective Evanson's hostility and badgering. (doc. no. 104 at ¶ 48).

### D.    Plaintiff and Mark Watt's Mobile Home Rental

According to David Kriley, manager of Green Acres Trailer Park located on Route 8 in Penn Township, Plaintiff and Mark Watt inquired about renting a trailer sometime in mid-July. (doc. no. 99 at ¶ 50; doc. no. 104 at ¶ 50). On July 19, 2004, Plaintiff and Mark Watt applied to rent a mobile home, agreeing to a monthly rental fee of $365.00 and to pay a security deposit in the amount of one month's rent prior to moving in. (doc. no. 99 at ¶¶ 51-52; doc. no. 104 at ¶¶ 51-52). It was noted on the application that Catholic Charities agreed to provide $200.00 of the initial security deposit and Plaintiff and Mark Watt agreed to provide the remaining $165.00, which they did, in cash, on July 20, 2004. (doc. no. 99 at ¶¶ 53-54; doc. no. 104 at ¶¶ 53-54). Mark Watt supplied the additional $165.00 in cash.

### E.    Plaintiff's Arrest and Subsequent Release

On January 10, 2005, Detective Evanson prepared a draft affidavit of probable cause that he later submitted to District Attorney William T. Fullerton, Esquire. (doc. no. 104, exh. 14). Mr. Fullerton emailed Detective Evanson, advising that the affidavit should be trimmed. (doc.

no. 112, exh. 28). Detective Evanson made the requested modifications and submitted the final Affidavit of Probable Cause to District Justice Steffe. Upon consideration of the Affidavit of Probable Cause, District Justice Steffe issued a warrant for Plaintiff's arrest for the charges set forth in the criminal complaint. (doc. no. 99 at ¶ 56).

On January 18, 2005, Plaintiff learned that the arrest warrant had been issued for her arrest and turned herself in at the Magisterial District Judge's office the following day. (Plaintiff's Pretrial Statement, doc. no. 89 at 5). A cash bond was set in the amount of $5,000.00. Plaintiff was unable to post bond, taken into custody and transported to the Butler County Jail where she spent five (5) days. (*Id.* at 6). Plaintiff posted bail on the sixth day and was released, and her trial was scheduled for September 19, 2005. (*Id.* at 7). In August, 2005, police in Brookville, Pennsylvania, apprehended Wilbur Brown for committing a similar crime whereupon he confessed to the robbery and sexual assault of Plaintiff. (doc. no. 99 at ¶ 57). All charges were withdrawn by the District Attorney's office without opposition by Detective Evanson. (*Id.* at ¶ 58).

### F. The "Landmark Attack"

At least one other rape was reported in Cranberry Township in 2004, and this occurred near the Landmark Building. (doc. no. 104 at ¶¶ 136-37; doc. no. 107 at ¶¶ 136-37). Detective Evanson was the lead investigator on this matter. (doc. no. 104 at ¶ 138; doc. no. 107 at ¶ 138). Plaintiff's situation and the Landmark Attack share a number of similarities, namely proximity in location and time as well as the style of the attack. Both attacks occurred roughly 1.5 miles and 91 days apart. (doc. no. 104 at ¶¶ 142-43). Both the Landmark Attack victim and Plaintiff were robbed of money and forced to perform oral sex on the assailant after having a black, semi-automatic handgun pointed at their head. (doc. no. 104 at ¶¶ 152-55; doc no. 107 at ¶¶ 152-55).

### G. Public Safety Director Mannell and Detective Meyer's Role

As Director of Public Safety, Steve Mannell was the head of the Cranberry Township Police Department and was responsible for the day-to-day supervision of the Department. (doc. no. 104 at ¶¶ 170-71). For a case that warranted investigation, Mannell would review the incident report and take it to the Detectives and advise them that they needed to look into the

matter further. (*Id.* at ¶ 176). In the investigation of rapes or robberies, Mannell was kept abreast of what was occurring in the investigation. (*Id.* at ¶ 178). In investigations deemed "important," Mannell would be kept abreast when a decision was made to take charges to the District Attorney and also kept apprised of the matter after the charges were filed. (*Id.* at ¶¶ 179-80). Throughout the investigation of Plaintiff's case, Detective Evanson kept Mannell up to date regarding Evanson's efforts on the case. (*Id.* at ¶ 183). Mannell approved the Detectives' handling of Plaintiff's case. (*Id.* at ¶ 187). He was also aware of the reason the decision was made to charge Plaintiff with theft and a false police report as he has stated "[i]f she had cooperated, had provided the information that we requested, made herself available for interviews, this wouldn't have happened." (*Id.* at ¶ 191; Mannell Depo. at 95:4-96:5, 160:3-6).

Detective Meyer assisted Detective Evanson at several points during the investigation, namely at the hospital and when Detective Evanson went to Plaintiff's mobile home to question her.

Defendants raise the defense of qualified immunity to all of Plaintiff's § 1983 claims and assert that the existence of probable cause defeats the remaining additional state law claims. They acted pursuant to a warrant for Plaintiff's arrest which assertedly was supported by the Affidavit. Plaintiff contends that Defendant Evanson made several material misstatements in and omissions from the Affidavit, and a corrected affidavit would not support probable cause for the crimes of filing a false police report, theft of property, and receiving stolen property.

**IV.   DISCUSSION**

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory in the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or any other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . .

42 U.S.C. § 1983. Thus, to establish a claim under § 1983, a plaintiff must establish the following elements: (1) the defendant acted under color of state law; (2) the defendant violated a

federal constitutional or statutory right; and (3) the violation caused injury to the plaintiff. *Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005).

In § 1983 cases, the question of probable cause is generally one for the jury. *See Merkle v. Upper Dublin School Dist.*, 211 F.3d 782, 789 (3d Cir. 2000). It is particularly a jury issue where probable cause rests on a credibility determination. *Id.* A district court, however, may conclude "that probable cause exists as a matter of law if the evidence, viewed most favorably to plaintiff, reasonably would not support a contrary factual finding." *Id.* (quoting *Sherwood v. Mulvihill*, 113 F.3d 396, 401 (3d Cir. 1997)). It is the responsibility of the court to determine the objective facts available to the officer at the time of the arrest and determine if they were sufficient to justify a reasonable belief that the plaintiff violated the law. *See Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir. 1997).

The issue of probable cause will be examined by discussing Detective Evanson's alleged falsehoods in and omissions from the Affidavit in order to determine whether it has to be corrected. If so, the corrected Affidavit will be examined to determine whether it still establishes probable cause.

### A.    Probable Cause

Plaintiff's Fourth and Fourteenth Amendment claims hinge on whether Defendants had probable cause to charge Plaintiff with the crimes in the warrant. The Fourth Amendment of the United States Constitution provides that people are "to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, . . . and no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV.

Articulating an exact definition for probable cause is difficult. In general, probable cause exists when the facts and circumstances within the arresting officer's knowledge give rise to a "fair probability" that the suspect has committed or is committing a crime. *Wilson v. Russo*, 212 F.3d 781, 789 (3d Cir. 2000). It is a commonsense concept that deals with "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Ornelas v. United States*, 517 U.S. 690, 695 (1996) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983)). As such, the probable cause standards is "not readily, or even

usefully, reduced to a neat set of legal rules." *Id.* at 695-96 (quoting *Gates*, 492 U.S. at 232). It is not a "finely-tuned" standard, comparable to the standards of proof beyond a reasonable doubt or proof by a preponderance of the evidence. *Id.* And it as a fluid concept that take its substantive content from the particular context in which the standard is being assessed. *Id.* at 696 (citing *Gates*, 462 U.S. at 232; *Brinegar v. U.S.*, 338 U.S. 160, 175 (1949) ("The standard of proof [for probable cause] is ... correlative to what must be proved").

While "the probable cause standard is incapable of precise definition or quantification," *Maryland v. Pringle*, 540 U.S. 366, 371, all determinations must be based on specific facts and circumstance that would warrant a prudent individual to believe there is a fair probability that an offense has been or is being committed. *See Wright v. City of Philadelphia*, 409 F.3d 595, 601-602 (3d Cir. 2005) (citing *Hill v. California*, 401 U.S. 797, 804 (1971) ("Sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment . . . .")); *Gates*, 462 U.S. at 246 ("probable cause does not demand the certainty we associate with formal trials."). And while it requires more than "mere suspicion," *Orsatti*, 71 F.3d at 482-83, it does not "require the same type of evidence of each element of the offense as would be needed to support a conviction." *Adams v. Williams*, 407 U.S. 143, 149 (1972). Thus, the evidentiary standard for probable cause is "significantly lower than the standard which is required for conviction." *Wright*, 409 F.3d at 602 (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979)).

Probable cause determinations require an analysis of the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 233 (1983). A determination of reasonableness under the Fourth Amendment may be based on factors which by themselves are susceptible of innocent explanation. *See U.S. v. Sokolow*, 490 U.S. 1, 10 (1989) ("We noted in *Gates*, 462 U.S. at 243-244, n. 13 ... that 'innocent behavior will frequently provide the basis for a showing of probable cause,' and that '[i]n making a determination of probable cause the relevant inquiry is not whether particular conduct is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of noncriminal acts.'"); *Draper v. United States*, 358 U.S. 307 (1959) (upholding probable cause arrest based upon tip from informant containing several innocuous corroborative elements that subsequently were witnessed by arresting officers); *Cf. United States*

*v. Arvizu*, 534 U.S. 266, 277 (2002) (holding that a determination of reasonable suspicion may be based entirely on factors which by themselves are susceptible of innocent explanation.).   And such determinations "need not rule a out a possibility of innocent conduct."  *Arvizu*, 534 U.S. at 277 (citing in support *Illinois v. Wardlow*, 528 U.S. 119 (2000)).

The principal components of the determination consist of the events which led up to the arrest, and then a decision must be made whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amounted to probable cause.  *Ornelas*, 517 U.S. at 696.  "The first part of the analysis involves only a determination of historical facts, but the second is a mixed question of law and fact: "[T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." *Id*. at 696-97 (quoting  *Pullman-Standard v. Swint*, 456 U.S. 273, 289, n. 19 (1982)).

Furthermore, the crime with which a suspect is eventually charged does not control the probable cause analysis.  *Id.*  Instead, "[p]robable cause need only exist as to any offense that could be charged under the circumstances." *Id.* (quoting *Barna v. City of Perth Amboy*, 42 F.3d 809, 819 (3d Cir. 1994)).

In undertaking a probable cause determination, a district court must examine the elements of the crime or crimes at issue.  *Wright*, 409 F.3d at 602.  Plaintiff was charged with theft by unlawful taking, receiving stolen property, and filing a false police report.  These defenses are defined as set forth below.

18 Pa. C.S. § 4906(b)(1) provides:

> (b) FICTITIOUS REPORTS. – Except as provided in subsection (c), a person commits a misdemeanor in the third degree if he:
>
>> (1) reports to law enforcement authorities an offense or other incident within their concern knowing it did not occur
>> . . . .

18 Pa. C.S. § 4906(b)(1).  Theft by unlawful taking appears at 18 Pa C.S. § 3921, which provides:

§ 3921.  Theft by unlawful taking or disposition

>(a) MOVABLE PROPERTY. – A person is guilty of theft if he unlawfully takes, or exercises unlawful control over, movable property of another with intent to deprive him thereof.

18 Pa. C.S. § 3921(a).  Receiving stolen property appears at 18 Pa. C.S. § 3294 and provides:

§ 3924.  Theft of property lost, mislaid, or delivered by mistake

>A person who comes into control of property of another that he knows to have been lost, mislaid, or delivered under a mistake as to the nature or amount of the property or the identity of the recipient is guilty of theft if, with intent to deprive the owner thereof, he fails to take reasonable measures to restore the property to a person entitled to have it.

18 Pa. C.S. § 3924.

Plaintiff's primary contentions are that Detective Evanson made material false statements in and omissions from the final draft of the Affidavit and that, if those misstatements and omissions are excluded and included, they would have negated probable cause. (*See* doc. no. 103 at 10-26).  Defendants maintain that the Affidavit contained ample facts and circumstances permitting District Justice Steffe to make a finding of probable cause.

An arrest warrant issued by a magistrate or judge "does not, in itself, shelter an officer from liability for false arrest." *Wilson*, 212 F.3d at 786 (citing *Sherwood*, 113 F.3d at 399).  A plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows, by a preponderance of the evidence: (1) that the police officer "knowingly and deliberately, or with a reckless disregard for the truth, made false statements or omissions that create a falsehood in applying for a warrant;" and (2) that "such statements or omissions are material, or necessary, to the finding of probable cause." *Id.* at 786-87 (quoting *Sherwood*, 113 F.3d at 399).

As to what constitutes a "reckless disregard for the truth," a showing that the officer acted with negligence or innocent mistake is insufficient.  *Wilson*, 212 F.3d at 787 (citing *United States v. Davis*, 617 F.3d 677, 694 (D.C. Cir. 1979)).  Acting with a reckless disregard for the truth has different meanings in dealing with omissions and assertions.  *Wilson*, 212 F.3d at 787.

Recognizing that "all storytelling involves an element of selectivity," the United States Court of Appeals for the Third Circuit has held that "omissions are made with a reckless disregard if an officer withholds a fact in his ken that 'any reasonable person would have known that was the kind of thing that a judge would wish to know.'" *Id.* at 787-88 (quoting *United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993)).  Assertions, on the other hand, can be made with reckless disregard for the truth "even if they involve minor details – recklessness [in this arena] is measured not by the relevance of the information, but the demonstration of willingness to distort the truth." *Wilson*, 212 F.3d at 788.  "[A]n assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubt as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Id.* (quoting *United States v. Clapp*, 46 F.3d 795, 801 n.6 (8th Cir. 1995)).

The false statements and omissions advanced by Plaintiff will be examined under the above standards to determine whether the Affidavit should be amended on the ground that Detective Evanson could be found to have acted with  reckless disregard for the truth.

> 1.  The Alleged False Statements and Omissions Regarding Detective Evanson's Meeting with Reedy
>
> > a.  Plaintiff's agreement to meet with the police and provide them with a written statement on July 15, 2004

Sentence 21 of the Affidavit states that "[p]rior to being released from UPMC victim agreed to provide Affiant with a written statement on 07-15-04."  Plaintiff contends that she did not agree to provide a written statement on July 15, 2004 and, therefore, this is a false statement. (doc. no. 103 at 12).  Sentence 23 of the Affidavit states that "[o]ver the next several days Affiant continued to attempt to make contact with Sarah Reedy with negative results."  Plaintiff contends that this is a false statement because she and her mother spoke with Detective Evanson on July 16, 2004 at the police station and Plaintiff provided a handwritten statement.  (doc. no. 103 at 13).  Sentence 32 of the Affidavit states that "[o]n July 23, 2004 Affiant met with Sarah Reedy and her mother at Cranberry Twp. Police Station . . . ."  Plaintiff contends that this is a false statement because, once again, she and her mother met with Detective Evanson on July 16, 2004. (*Id.*).

Plaintiff testified in her deposition that when asked by Detective Evanson to come in the next day, she told him: "I don't know if I can come in tomorrow and do this for you. It's already 3 o'clock in the morning. I got to get up early and go to school." (Reedy Depo. at 98:10-20). When asked about the July 23 date, Plaintiff answered:

> I believe that [the] robbery happened on a Wednesday. I know I went down that Friday I dropped off my uniforms and tried to pick up my paycheck, and I got the cops called on me for trying to drop off my uniforms and return them.
> And then I went to the police station to make a written statement because my mother said the only way she would go ahead and cash my paycheck is if I went to the police station and made a written statement, because she had been talking to Detective Evanson on the phone. So I believe it was the 16th when I went down.

(Reedy Depo. at 101:10-23). Plaintiff's mother, Debbie Bosco, also testified that she recalled going into the police station on Friday, July 16, 2004. When asked whether she went to the police station the same week as the incident or the following week, Ms. Bosco stated: "It was the same week. It was only the day after, two days after. Wednesday it happened. Thursday I talked to Detective Evanson. Friday we were in the police station." (Debbie Bosco Depo. at 29:4-7). Plaintiff's mother testified that upon reading the Affidavit, she told her daughter that "[t]hese [dates] aren't right." (*Id.* at 30:10).

Given the testimony of Plaintiff and her mother, a jury, after drawing all inferences in a light most favorable to Plaintiff, could conclude that Detective Evanson had "obvious reasons to doubt the accuracy of the information he reported." *Wilson*, 212 F.3d at 788. Therefore, a jury could conclude that Detective Evanson acted with reckless disregard for the truth regarding the date of his meeting with Plaintiff and her family. The corrected affidavit must reflect the date of the meeting as July 16, 2004.

Sentence 22 of the Affidavit states that Detective Evanson unsuccessfully attempted to contact Plaintiff on July 15, 2004. (doc. no. 103 at 13). Plaintiff believes that Detective Evanson omitted that he spoke to her mother on July 15, 2004 and she arranged for her daughter to go to the police station on July 16, 2004. (*Id.*). Debbie Bosco testified that she placed a call to Detective Evanson on Thursday, July 15, 2004, the day after the incident, to discuss the situation.

(*See* Debbie Bosco Depo. at 28:11-30:10). Detective Evanson omitted this information with reckless disregard for the truth if "any reasonable person would have known [this fact] was something that the judge would wish to know." *Wilson*, 212 F.3d at 787. Drawing all inferences in favor of Plaintiff, a jury could conclude that a judge would wish to know that Detective Evanson at least spoke with Plaintiff's mother during his attempts to contact Plaintiff. The corrected Affidavit must reflect that Detective Evanson spoke with Plaintiff's mother the day after the incident.

<u>b. Statement regarding the purpose of the meeting</u>

Sentence 32 of the Affidavit states that the purpose of the meeting at the police station was "[t]o discuss the alleged Assault and Robbery that occurred on 07-14-04." Plaintiff contends that this is a false statement because the true purpose of the meeting was to have her "confess to the crime." (doc. no. 103 at 13). Plaintiff's step-father, Paul Bosco, testified that while Plaintiff was writing her statement at the police station, Detective Evanson approached him and Debbie Bosco and told them he knew that Plaintiff and her boyfriend, Mark Watt, were responsible for the robbery. (doc. no. 103 at 14; doc. 104 at ¶ 112; Paul Bosco Depo. at 15:13-16). Further, Detective Evanson informed Plaintiff's parents that it was only going to be "a matter of time . . . before he tied up the loose ends and put it all together so it would be in her best interests if [they] would encourage her to . . . admit it." (doc. no. 103 at ¶¶ 113-115; Paul Bosco Depo. at 15:17-20). According to Paul Bosco, Detective Evanson had Plaintiff and her parents believe that if she confessed that the incident was Mark Watt's idea, the police would send her home and nothing serious would happen to her. (doc. no. 103 at 14; Paul Bosco Depo. at 18:2-8). Further, Paul Bosco stated that Detective Evanson said he wanted to "burn" Mark Watt and he was going to do it. (Paul Bosco Depo. at 41:11-19). Detective Evanson denies making these statements. (*See* doc. no. 107 at ¶¶ 112-115). Finally, Plaintiff testified that while at the meeting, she was "insulted" because Detective Evanson requested that she be hooked up to a polygraph. (Reedy Depo. at 111:23-25).

Drawing all inferences in Plaintiff's favor, a jury could conclude that, because he stated to Plaintiff's parents that he wished to elicit a confession from Plaintiff, Detective Evanson had

"obvious reasons to doubt the accuracy" of Sentence 32. *Wilson*, 212 F.3d at 787. While Detective Evanson did ask Plaintiff to come to the police station to discuss the incident, an accurate statement would be that he also wanted to discuss the possibility that she fabricated the incident to cover for her boyfriend. The corrected affidavit must reflect this change.

### c. Statment that Plaintiff Verbally Abused Detective Evanson

Plaintiff argues that Detective Evanson falsely characterized her reaction to his questioning by indicating she became "verbally abusive." (doc. no. 103 at 14). Paul Bosco testified that he would have called her reaction "upset." (Paul Bosco Depo. 33:24-25). Drawing all inferences in Plaintiff's favor, it is reasonable to conclude that she became upset at Detective Evanson's line of questioning rather than "verbally abusive." The corrected affidavit must reflect this change.

### 2. Omissions of the Details of the Sexual Assault

Plaintiff avers that Detective Evanson omitted every detail Plaintiff provided regarding the sexual assault and the fact that she reported the assault in graphic detail to a number of officers and a nurse while at the hospital on the night of the incident. (doc. no. 103 at 15-18). As stated above, Plaintiff provided a detailed description of the incident to Corporal Mascellino, which he entered into the Police Report. (doc. no. 104 at ¶ 63). Detective Evanson included this description in the Draft Affidavit, but deleted it before he filed the Affidavit with the District Justice. (doc. no. 103 at 16; doc. no. 104 at ¶¶ 64-66).

Sentences 14 and 15 of the Affidavit state, "[s]uspect opened register and removed cash from same. Suspect then ordered victim to disable phone lines located in rear office area." Plaintiff points to Detective Evanson's entry into the Police Report to show that he omitted the details of the assault that took place between the time the assailant took money from the register and the time he ordered Plaintiff to disable the phone lines in the rear office. (doc. no. 103 at 16). Detective Evanson made the following entry into the police report:

> [S]uspect ordered victim to take off her shirt which she did while he
> faced her looking out the windows and unzipped his pants exposing
> his penis. Suspect then stated "Suck my dick and don't bite it or I'll
> shoot you." Victim performed oral sex on suspect as he fondled her
> breasts and prior to him ejaculating suspect told victim to swallow it

17

> or he would hurt her so victim complied. Suspect then ordered
> victim into back office area where he again ordered her to sit on the
> floor. Suspect viewed that the safe door was partially opened and
> then ask [sic] victim if there was any money in the safe. Victim
> responded "yes" and then removed the money from the safe and
> handed it to the suspect.

(doc. no. 103 at 16-17; doc. no. 104 at ¶ 67, exh. 1, Police Report, at 4). Furthermore, while at the hospital Plaintiff informed the officers that she did not need a representative from the victim support service VOICE because she had been sexually abused by her grandfather and knew how to handle the situation. Detective Evanson made the following entry in the police report:

> Victim used graphic profanity to describe sexual acts that she was
> forced to perform on suspect. Officers offered victim the services
> of a VOICE representative on several occasions which she refused
> and stated that she had been sexually abused as a child by her
> grandfather and was familiar with how to deal with the situation.

(doc. no. 103 at 17; doc. no. 104 at ¶ 205, exh. 1, Police Report, at 5). Detective Evanson included both entries from the Police Report in the Draft Affidavit but excluded them from the final Affidavit. (doc. no. 103 at 17).

Further, Plaintiff notes that Detective Evanson omitted all the details from Nurse Farah's narrative, which Detective Evanson obtained prior to leaving the hospital. (doc. no. 103 at 18). This narrative noted that Plaintiff received treatment and an examination from Nurse Farah. (*Id.*; doc. no. 104 at ¶ 207, exh. 16). Nurse Farah's Narrative also quoted Plaintiff as saying "[t]hey're calling me a liar." (doc. no. 104 at ¶ 82, exh. 16). The Narrative included a graphic description of the attack similar to the one Plaintiff gave to Corporal Mascellino. (doc. no. 103 at 18; doc. no. 104 at ¶¶ 84-86, exh. 16).

Keeping in mind that "all storytelling involves selectivity," the Affidavit need not include all of the graphic details of the sexual assault. *See Wilson*, 212 F.3d at 787. However, drawing all inferences in a light most favorable to Plaintiff, a jury could conclude that a magistrate would want to know that Plaintiff provided two separate accounts of the assault in graphic detail to Corporal Mascellino and Nurse Farah and that these accounts were consistent. A magistrate would also like to know that Plaintiff was treated for the assault and submitted to a rape examination. These omissions must be included in the corrected affidavit.

### 3.     Facts Relating to the Store's Panic Alarm Button

Sentence 36 of the Affidavit states that "Affiant at the time advised Miss Reedy that Affiant had received confirmation from Security Systems of America that due to a power failure that occurred at 2214 hours an alarm was signaled at 2314 hours."  This means that the power supply to the alarm was cut off at 10:14 P.M., twenty-six (26) minutes prior to the incident.  (doc. no. 104 at ¶ 28).  Plaintiff contends that this is only relevant to a probable cause determination if she would have tried to use the panic alarm and it was inoperable.  (doc. no. 103 at 20).  She further notes that Detective Evanson omitted the fact that he believed Plaintiff's failure to press the panic button might have been due to the fact that the assailant held a gun to her head and she was too distraught to reach for it.  (doc. no. 104 at ¶ 125).  Detective Evanson testified to as much in his deposition.  (Evanson Depo. at 180:22-181:2).

Plaintiff argues that Detective Evanson further omitted details surrounding the investigation of the panic alarm on the night of the incident.  (doc. no. 103 at 20).  Officer Kobistek did a "practice demonstration" to see if the panic alarm worked, and the 911 department reported a panic alarm at 1:40 A.M. on July 15, 2004.  (doc. no. 104 at ¶ 128; Evanson Depo. at 437:13-19).  Therefore, had Plaintiff attempted to hit the alarm during the incident, it would have worked.  (doc. no. 104 at ¶ 130).

Given the fact that the Affidavit devoted nine sentences to the alarm system and its power supply, a jury could conclude that a magistrate would like to know some additional details about the panic alarm, including the fact that it would have worked had Plaintiff attempted to use it and that Plaintiff may have been too distraught to make such an attempt due to a gun being pointed at her head at the time.  There is some dispute as to whether Detective Evanson was aware of the investigation of the panic alarm at the time he filed the Affidavit.  (Defendants' Reply, doc. no. 109 at 14).  However, drawing all inferences in a light most favorable to Plaintiff, it must be assumed that he was.  Therefore, this information must be included in the corrected affidavit.

### 4.     Plaintiff's Description of the Attacker and Carol Hazlett's Presence at and Departure from the J&G Gulf Station

Sentence 18 of the Affidavit states that Plaintiff advised the officers that the assailant was

"between 28 and 31 years of age." Plaintiff testified that her "words were from his mid-30's to early 40's." (Reedy Depo. at 61:15-16). She also told Nurse Farah the same, and the description appears in Nurse Farah's Narrative. (doc. no. 104, exh. 16). Given these descriptions of record, Detective Evanson had "obvious reasons to doubt the accuracy" of this particular statement. *Wilson*, 212 F.3d at 787. Plaintiff's description of the assailant's age must be included in the corrected affidavit.

Sentence 25 of the Affidavit states that, on the day of the incident, "Ms. Hazlett stated that at approx. 2115 hrs. she proceeded home . . . ." However, Ms. Hazlett testified that she proceeded home at approximately 3:00 p.m. once Plaintiff arrived for her shift. (Hazlett Depo. at 41:7-8). She did not return to the store until after she received the phone call from the alarm company at approximately 11:20 p.m. (Hazlett Depo. at 41:14-17). Although a minor detail, Ms. Hazlett's testimony gives Detective Evanson an "obvious reason[] to doubt the accuracy" of Sentence 25. Ms. Hazlett's correct departure time will be included in the corrected affidavit.

<u>5. Omissions Regarding the "Landmark Attack"</u>

Plaintiff contends that Detective Evanson should have included details in the Affidavit about the "Landmark Attack" because he was the lead investigator on that case as well. (doc. no. 103 at 21-22). Both attacks involved a robbery and sexual assault at gunpoint of Caucasian females by similarly described assailants. (*Id.* at 22). Both attacks also occurred in close proximity to one another in both location (1.5 miles) and time (91 days). (*Id.*). The graphic details of the assault are also similar. (*Id.*). Plaintiff also offers the testimony of Corporal George Cronin of the Pennsylvania State Police, who is prepared to opine that the similarities between the attacks are both relevant and "fairly obvious," and that he would expect a detective who was investigating both of these cases to recognize the similarities. (doc. no. 104 at ¶ 202; Cronin Depo. at 5:8-16, 64:25-65:13, 66:6-77:18, 96:17-98:5).

A reasonable person would conclude that a magistrate does not need to know every single detail regarding Plaintiff's attack as compared to the "Landmark Attack" in order to be apprised that the two share general similarities. Such details neither add to nor subtract from the probable cause determination. However, drawing all inferences in a light most favorable to Plaintiff, a jury

could conclude that a magistrate would want to know that in October of 2004 Detective Evanson investigated a robbery and sexual assault with several similarities to Plaintiff's described attack. This additional information must be included in the corrected affidavit.

### 6. Materiality

Because there is sufficient evidence of omissions and assertions made knowingly, or with reckless disregard for the truth, the next step is to assess whether these false statements or omissions were "material, or necessary, to the finding of probable cause." *Wilson*, 212 F.3d at 789 (quoting *Sherwood*, 113 F.3d at 399) (internal quotations omitted). "To determine the materiality of the misstatements and omissions, we excise the offending inaccuracies and insert the facts recklessly omitted and determine whether or not the 'corrected' warrant affidavit would establish probable cause." *Wilson*, 212 F.3d at 789 (citing *Sherwood*, 113 F.3d at 400). If it does, then Summary Judgment must be granted to Detective Evanson because he had probable cause to arrest Plaintiff even if there had been no omissions or inaccuracies. *See Wilson*, 212 F.3d at 789.

Performing such surgery to the Affidavit filed with District Justice Steffe would produce an Affidavit that reads:[6]

> (1) On July 14, 2004, Cranberry Township Police Officers were dispatched to the J&G Gulf Station for a reported robbery.
>
> (2) The call was placed by Bob McGee from Jordan's Service Center located next to J&G Gulf Station.
>
> (3) Mr. McGee advised the officers that the female clerk (later identified as Plaintiff) from J&G Gulf just ran into the garage and told him that she was robbed.
>
> (4) While McGee was on the phone with 9-1-1, Plaintiff also stated that she was sexually assaulted.
>
> (5) The actor was described as a male approximately 5'6" to 5'7" tall, wearing a blue baseball cap, blue jeans, and blue boxers.
>
> (6) Plaintiff was unsure of which direction the actor left the area or any vehicle description.
>
> (7) Corporal Mascellino transported Plaintiff, along with Mark Watt, Plaintiff's boyfriend, to the ER at UPMC Cranberry.

---

[6]Changed or additional information appears in brackets.

(8) Upon arriving at UPMC Cranberry, Detective Evanson was met by Corporal Mascellino.

(9) Corporal Mascellino and Detective Evanson proceeded to the room where Plaintiff was being treated.

(10) Plaintiff advised officers that at approximately 10:40 P.M. a white male [in his mid 30's to early 40's], approximately 5'6" - 5'8" in height entered the store and picked up a pack of gum then proceeded to the counter to purchase same.

(11) As he approached the counter, the suspect lifted his shirt and pulled a black semi-automatic handgun from the waist band of his pants and proceeded to point said gun at Plaintiff.

(12) Suspect then proceeded to Plaintiff's side of the counter ordering her to sit on the ground.

(13) Suspect asked Plaintiff how to open the register, at which time she told the suspect to hit the "no sale" key to open the drawer.

(14) Suspect opened the register and removed cash from same.

(15) At this time, the suspect sexually assaulted Plaintiff by forcing her to perform oral sex on him.

(16) The suspect then ordered Plaintiff to disable the telephone located in the rear office area, to which she complied and pulled telephone from the wall by pulling on the phone and throwing it on the floor in the middle of the room.

(17) Suspect then advised Plaintiff to remain in the room for five minutes after he leaves.

(18) Suspect left through the front door and fled in an unknown direction.

(19) Shortly thereafter, Plaintiff exited through the rear door of the establishment and ran to Jordan's Garage located next to the Gulf Station.

(20) Corporal Mascellino asked Plaintiff if she knew at what time the incident occurred.

(21) Plaintiff stated that it was 10:40 P.M.

(22) Prior to being released from UPMC, Plaintiff agreed to provide the officers with a written statement [at some point following the incident].

(23) [Although Detective Evanson was unable to contact Plaintiff directly the day after the incident, he did speak with Plaintiff's mother, Debbie Bosco].

(24) While conducting follow-up investigation of the reported

22

robbery and assault, Plaintiff contacted Carol Hazlett, the manager of the Gulf Station, who confirmed that on July 14, 2004, she was in the store until [approximately 3:00 P.M when Plaintiff arrived for her shift.]

(25) While at home that evening, Ms. Hazlett was contacted by the station alarm company, Security Systems of America, who advised her that the power source for the alarm was interrupted and that after a one hour delay it failed to restore.

(26) The alarm company attempted to make telephone contact with the Gulf Station, but there was no answer.

(27) Ms. Hazlett at this time proceeded back to the Cranberry Township station where she was made aware of the reported robbery and assault.

(28) Ms. Hazlett stated that while at the station she checked the power cord of the alarm located behind the desk in rear office and discovered that it had been unplugged.

(29) Ms. Hazlett also advised Detective Evanson that she had pulled the register tape for the night of July 14, 2004 and found that the NS (no sale) key had been pushed at 9:40 P.M. and that this time is one hour behind actual time, meaning that the NS key was pushed at 10:40 P.M.

(30) Detective Evanson asked Ms. Hazlett about the clock in the station and if it was in sync with the time on the register to which Ms. Hazlett confirmed that the wall clock is not in sync with the register clock.

(31) Ms. Hazlett also advised the reporting officer that the amount of money taken during the robbery was $606.73

(32) [Plaintiff, along with her mother and step-father, Paul Bosco, met with Detective Evanson at the Cranberry Township Police Station on July 16, 2004. While there, Plaintiff provided a written statement.]

(33) Detective Evanson met with Plaintiff and her parents to discuss the alleged assault and robbery [as well as to discuss the possibility that Plaintiff had fabricated the incident to cover for her boyfriend, Mark Watt. Further, Detective Evanson intimated that if Plaintiff confessed, nothing serious would happen to her.]

(34) Detective Evanson asked Plaintiff if during the assault, when the actor ordered her to disable the phones, if she had pulled any other wires, and, if so, where were the wires located.

(35) Plaintiff stated that she only disabled the telephone by grabbing the base of the phone and pulling it from the wall.

(36) Detective Evanson then asked Plaintiff if the suspect disabled any wires for electricity or the alarm, and Plaintiff again replied

"no," further confirming that the suspect did not go behind the desk in the rear office nor did he pull any power lines from the wall behind the desk in the rear office.

(37) Detective Evanson at this time advised Plaintiff that he had received confirmation from Security Systems of America that due to a power failure that occurred at 10:14 P.M. an alarm was signaled at 11:14 P.M.

(38) Plaintiff stated that she did not know how that would have occurred.

(39) Detective Evanson then went on to advise Plaintiff that said power failure occurred as a result of the power cord behind the desk in the rear office being unplugged.

(40) When asked how the alarm plug was pulled roughly twenty (20) minutes prior to the robbery, Plaintiff [grew upset] and stated "I just want to drop the whole thing."

(41) When Detective Evanson advised Plaintiff that it could not be dropped due to the alleged robbery and theft she became very agitated and replied "I just want this whole thing to go away."

(42) Detective Meyer contacted Park Manager David Kriley ("Park Manager") of Green Acres Trailer Park located on Route 8 in Penn Township who provided the following information.

(43) Kriley advised that he was contacted by Mark Watt and Plaintiff sometime in mid-July at which time they were inquiring about renting a mobile home.

(44) Mark Watt and Plaintiff were told that the monthly rent would be $365.00 with a security deposit equal to one month's rent to be provided to Green Acres prior to moving in.

(45) Kriley indicated that Mark Watt and Plaintiff applied to rent a mobile home on July 19, 2004, agreeing to the monthly rental fee of $365.00.

(46) On the initial application, Catholic Charities indicated that they would provide Green Acres with $200.00 of the initial security deposit with Mark Watt and Plaintiff to provide the remaining $165.00.

(47) On July 20, 2004, Mark Watt provided Kriley with $165.00 cash to fulfill the remainder of the security deposit.

[(48) While at the hospital, Plaintiff gave consistent accounts of the robbery and assault with the same graphic detail to Corporal Mascellino and Nurse Farah.]

[(49) Plaintiff refused to speak to a representative from VOICE because she claimed she was sexually abused by her grandfather as a child and knew how to handle the situation.]

[(50) Plaintiff was treated for the sexual assault and submitted to a rape kit.]

[(51) Detective Evanson was aware of these details and he entered them into the Police Report.]

[(52) An investigation of the panic alarm during the night of the incident confirmed that if Plaintiff had attempted to press the panic alarm, it would have worked.]

[(53) Plaintiff may not have attempted to use the panic alarm because she could have been too distraught due to a gun being pointed at her head.]

[(54) Detective Evanson was the lead investigator in the only other sexual assault reported in Cranberry Township in 2004. Like Plaintiff's case, this incident involved a reported robbery in which the assailant ordered the victim, a Caucasian female, to perform oral sex prior to leaving with the money.]

("the Corrected Affidavit").

Based on this information, and after drawing all inferences in a light most favorable to Plaintiff, Detective Evanson's affidavit, as corrected, still establishes probable cause to believe that Plaintiff "reported to law enforcement authorities an offense or other incident within [her] concern knowing it did not occur." 18 Pa. C.S. § 4906(b)(1).

Plaintiff points to several false statements or omissions regarding the purpose of Detective Evanson's July 16, 2004 meeting with her and her parents. However, whether Detective Evanson had a predisposition towards Plaintiff's potential fabrication of the entire incident from the start of his investigation does not change the inculpatory information concerning Plaintiff's indecisiveness about any follow-up meeting with Detective Evanson. Further, the actual date of the meeting is immaterial. The fact remains that although Plaintiff and her parents did actually meet with Detective Evanson at the Cranberry Township Police Station where Plaintiff provided a written statement while Detective Evanson spoke with her parents (*see* Evanson Depo. at 207:2-5), Plaintiff was unwilling to provide a firm commitment to meet with the police in follow-up on the night in question and did not make herself available until Detective Evanson continued to press the matter with Plaintiff's parents. The inference of reluctance to be available to the police was fairly raised by Plaintiff's behavior. As for the misstatements regarding Plaintiff's

description of the assailant's age or the exact time Ms. Hazlett left the Gulf station, such mistakes may show that Detective Evanson did not pay sufficient attention to Plaintiff's initial report, but they are ultimately immaterial to any probable cause determination.

The most exculpatory amendments to the affidavit are the facts that Plaintiff provided graphic accounts of the robbery and sexual assault to both Corporal Mascellino and Nurse Farah, and these accounts shared very similar details. Added to the Affidavit, these additional facts show Plaintiff was consistent in her story. Further, amending the date of Plaintiff's meeting with Detective Evanson to July 16, 2004, removing the misstatement that she agreed to provide a written statement on July 15, and noting that Detective Evanson set up a line of communication with Plaintiff's mother weaken the inferences that Plaintiff was evasive and uncooperative. However, they do not destroy the inference that Plaintiff was reluctant to submit to further interaction with the police. Detective Evanson attempted to contact Plaintiff on July 15 but was only able to reach her voice mail. That he had to make arrangements for the meeting through Plaintiff's mother permits the inference that she was trying to avoid further contact with the police.

These additional exculpatory facts do not undermine the inculpatory evidence that established probable cause in the first instance: (1) the theft occurred while Plaintiff was the sole employee in control of the premises during the premises' business hours; (2) power to the alarm system had been disabled approximately twenty (20) minutes prior to the incident; (3) the alarm system had been unplugged from its socket behind a desk in the premises' rear office; (4) Plaintiff stated the perpetrator was not in the area where the plug to the alarm system was located; (5) Plaintiff admitted that the alleged perpetrator did not disable any lines for electricity or the alarm; (6) Plaintiff could not provide any information about how the assailant had arrived at the gas station or what direction the assailant left the scene; (7) when asked why the alarm would have been pulled approximately twenty (20) minutes prior to the robbery and assault, Plaintiff grew upset and stated "I just want to drop the whole thing" and when confronted with the proposition that the matter could not be dropped Plaintiff responded "I just want this whole thing to go away;" (8) a large amount of cash was taken from the gas station; (9) Plaintiff's boyfriend was at the

scene a very short time after the incident was reported; and (10) five days after the incident, Plaintiff's boyfriend made a cash deposit of $165.00 for the rental of a mobile home that he and Plaintiff had been looking at just a few days before the incident and he and Plaintiff were prepared to make the first month's rent of $365.00.  (*See* doc. no. 109 at 5).

The inculpatory information in the Affidavit provides sufficient facts and circumstances which create a fair probability that Plaintiff committed the crime of giving a false report.  First, the information surrounding Plaintiff's undertakings with Mark Watt provided a motive for committing the crime: to gain access to additional cash for the purpose of obtaining a mutually shared residence.  Second, by Plaintiff's own admission, she was the only individual on the premises who could have disabled the alarm system.  Third, the alarm system was disabled approximately twenty minutes prior to the reported robbery and assault and no explanation as to how it was disabled had surfaced.  Fourth, Plaintiff was unable to provide any information about how the perpetrator arrived at the gas station or anything about how he left the scene beyond exiting out the front door.  Fifth, Plaintiff's boyfriend arrived at the scene very shortly after the crime was committed, and thus was not far from the gas station that evening.  Sixth, Plaintiff reported the robbery as occurring at the exact minute the no sale key had been pushed, which suggested she was aware of the precise time  the no sale key had been pushed.  Seventh, Plaintiff agreed to provide a written statement of the event on the night of the crime but did not agree to a firm date and time and an additional meeting with Plaintiff had to be arranged through Plaintiff's mother.  Eight, Plaintiff grew upset and repeatedly attempted to avoid any further discussion about the incident when she was questioned about the inconsistencies involving the alarm system becoming disabled twenty minutes before the reported crime.  Ninth, Plaintiff and her boyfriend paid a cash deposit after enlisting the aid of a charitable organization for a portion of the security deposit and indicated an ability to pay the first month's rent within a short period of time.  In combination this represented an ability to pay $530.00 and $606.73 had been taken from the gas station.

Plaintiff has the burden of proof in establishing sufficient evidence to support her § 1983 claim for unlawful arrest and the claims related thereto.  Proof that will support a finding of

violation of a constitutional right is essential to these claims. The Affidavit as revised provides probable cause to believe there was a fair probability that Plaintiff committed the crimes of false report and theft of property.[7] Accordingly, defendants are entitled to summary judgment on Plaintiff's claims for unlawful seizure, false imprisonment, and malicious prosecution under the Fourth Amendment, violation of liberty interests under the Due Process Clause of the Fourteenth Amendment, and false arrest, false imprisonment, and abuse of process under state law.

### B. Qualified Immunity

Even if a genuine issue of fact exists as to whether Detective Evanson's affidavit, as corrected, establishes probable cause, Detective Evanson has met his burden of proving entitlement to qualified immunity. The United States Supreme Court long age recognized that " government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The privilege created by the doctrine is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Its goal is "to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Harlow*, 457 U.S. at 818. And the scope of protection extends to protect "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In *Saucier v. Katz*, 533 U.S. 194 (2001), the Supreme Court established a two-part test to determine whether a defendant is entitled to qualified immunity. First, "[t]aken in the light most

---

[7]The above analysis is based on the core information that was contained in the Affidavit submitted to District Justice Steffe. The corrected version actually contains information that adds additional support for a finding of probable cause when combined with the core information. As discussed *infra*, Plaintiff's declining professional counseling after it was offered repeatedly and the fact that she did not attempt to press the panic alarm at any time during the events happening behind the counter in the front room, while susceptible of innocent explanation, add to the quantum of information supporting a finding of probable cause.

favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Id.* at 201. If no constitutional right was violated, "the qualified immunity inquiry is at an end; the officer is entitled to immunity." *Bennet v. Murphy*, 274 F.3d 133, 136 (3d Cir. 2002). If, however, the facts read in the light most favorable to the plaintiff show a violation of a constitutional right, the analysis proceeds to a second step: "whether the right was clearly established . . . in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. A right is clearly established in the particular context if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202. However, if it was not clear "to a reasonable officer what the law required under the facts alleged, then he is entitled to qualified immunity." *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004).[8]

In this setting the Third Circuit has explained: "[s]ummary Judgment is appropriate if no reasonable jury could conclude that [the plaintiff's] clearly established rights were violated." *Wilson*, at 786 (citing *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). The court continued:

> This does not mean that the jury determines the contours of that right. Rather, after making a legal determination about the existence of a right, and whether it is clearly established, we determine whether the facts on the record are such that a jury could conclude that a clearly established right was violated . . . As a methodological matter, we commonly work backwards: We arrange the facts in a light most favorable to the plaintiff, and then determine whether, given precedent, those "facts," if true, would constitute the deprivation of a right. And then, if necessary, we

---

[8]Although *Saucier* mandated that a court must first determine whether a constitutional right has been violated before examining whether the right was clearly established, the Supreme Court recently clarified that lower courts retain the discretion to determine the order of the qualified immunity analysis in order to promote judicial efficiency and avoid unnecessary analysis of difficult constitutional questions. *Pearson v. Callahan*, – U.S. – ,129 S. Ct. 808, 818 (January 21, 2009) ("On reconsidring the procedure required in *Saucier*, we conclude that while the sequence set fort there is often appropriate, it should no longer be regarded as mandatory. The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand.").

determine if that right is clearly established.

*Wilson*, 212 F.3d at 786 (citation omitted).   We embark on this endeavor.

Defendants essentially concede that citizens have a clearly established right not to be arrested pursuant to a warrant obtained on the basis of the affiant's deliberate falsehood for the truth in a probable cause affidavit.  (doc. no. 97 at 7).   But this position assumes that there were no additional facts and circumstances in the Affidavit that provided a lawful basis for Plaintiff's arrest in any event.  If there were, then the underlying right to be free from arrest without probable cause could not have been violated.  Therefore, the primary inquiry is whether Defendants violated Plaintiff's Fourth Amendment rights by arresting her without probable cause.

As set forth above, this assessment essentially ends the inquiry because the Affidavit contains core facts and circumstances that created probable cause for Plaintiff's arrest.  But even if it is assumed that the Affidavit as presented or corrected did not provide probable cause, defendants still are entitled to qualified immunity because it cannot be said that defendants violated plaintiff's right to be free from unlawful arrest in the specific context and circumstances that confronted them.

The constitutional validity of the arrest does not depend on whether the suspect actually committed the crime.  *Wright*, 409 F.3d at 602 (citing *Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir. 2003)).   "It is inevitable that law enforcement officers will in some cases reasonably but mistakenly conclude that probable cause to make an arrest is present.  The Court has made clear that in such cases [the] officers, like other officials who act in ways they reasonably believe to be lawful, will not be held personally liable."  *Orsatti*, 71 F.3d at 483.   The test is an objective one based on what a reasonable competent officer would believe under the known facts and circumstances.  *Id*. 483.  Under this approach whether a police officer is immune is governed by the same standard of objective reasonableness that applies in the context of a suppression hearing under *United States v. Leon*, 468 U.S. 897 (1984).  Under this standard, immunity is lost  only "where the warrant application is 'so lacking in indicia of probable cause as to render official belief in its existence unreasonable.'"  *Id*. (quoting  *Malley*, 475 U.S. at 341.  And "the reasonableness of an official's belief in the existence of probable cause is whether a reasonably

well-trained officer would have known that his affidavit failed to establish probable cause and that he therefore should not have applied for the warrant under the conditions." *Id.*   In other words, a police officer may be liable for civil damages for an unlawful arrest only if "no reasonable competent officer" would conclude that probable cause exists. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

In addition to the core facts and circumstances set forth in the Affidavit, Dectective Evanson had accumulated a number of other facts and circumstances bearing on the determination of whether probable cause existed for Plaintiff's arrest.  Detective Evanson waited roughly six months before filing the final Affidavit (doc. no. 97 at 3).  He formulated his theory that Plaintiff falsified the report of the robbery and sexual assault because she had both a motive, namely the need for money to rent a trailer with Mark Watt, and opportunity, as she was the only employee in the J&G Gulf Station on the evening of July 14, 2004.  (*See* Evanson Depo. at 218:18-219:20). He knew Plaintiff was homeless at the time the incident occurred and was living in a station wagon on Mark Watt's property.  (*See* Evanson Depo at 220:15-16; Reedy Depo. at 124:8-22). He knew they both were looking to rent a trailer and needed the money to do so.  (Evanson Depo. at 220:9-10).  From conversations with the J&G Gulf manager, Ms. Hazlett, and Plaintiff's mother, Debbie Bosco, he became aware that upon engaging in a relationship with Mark Watt, her performance at work and school began to slip and she started using marijuana.  (Evanson Depo. at 178:12-179:10, 208:14-209:10).  This change in behavior led to a "falling out" between Plaintiff and her mother.  (Reedy Depo. at 124:11-14). Furthermore, he also knew that Plaintiff reported that (1) the safe was left open in the backroom at 10:40 p.m.; (2) the perpetrator committed the robbery and sexual assault out in front of the gas station "were everyone could see;" (3) the perpetrator then ordered Plaintiff into the backroom and followed her into it whereupon she disabled the telephone;  (4) the perpetrator came to focus on the safe and asked Plaintiff if there was any money in it; (5) Plaintiff took additional cash from the safe and gave it to the perpetrator before he exited out the front door; (6) Plaintiff did not report attempting to press the panic alarm; and (7) Plaintiff declined professional counseling by a victim's rights group.

In addition to the facts and circumstances in the final Affidavit providing a firm basis to

believe Plaintiff had motive and opportunity, was reluctant to further meet and discuss the matter with the police, had made statements suggesting she had a guilty conscience about the matter, had engaged in preplanning the theft, had provided details which suggested she knew precisely when the cash register had been opened, and had acquired a trailer that required a sum of money comparable to the amount take, Plaintiff's living arrangements, recent spiral into the use of controlled substances and downward turn in her relation with her mother, not pressing the panic button, declining victim counseling, and the series of events reported about how the perpetrator came to be in the backroom where the safe was open with additional money being in it at 10:40 p.m., added additional circumstantial information to support a reasonable belief that there was a fair probability that Plaintiff had inside information about the funds reported as stolen. The circumstances surrounding her living arrangements and recent drug use added to the circumstances indicating she had a motive for the crime. The fact that no attempt had been made to press the panic button added to the circumstances surrounding the alarm system that suggested there was preplanning involved. The decision to decline counseling services added to the circumstances suggesting an event separate from the one reported had occurred. The reported series of events explaining how the perpetrator had came to know the safe was left open at 10:40 p.m. added to the circumstances suggesting Plaintiff had opportunity and had engaged in preplanning the theft. Furthermore, there is evidence, not discussed in the Affidavit, that during a meeting, Plaintiff and Detective Evanson set a date for a polygraph examination, but Plaintiff failed to appear on that date, which added to the inference that Plaintiff was unwilling to provide additional assistance to the police to dispel their belief that she was involved. (*See* Mannell Depo. at 95:8-23).

The standards for qualified immunity in a probable cause determination provide that "[a] police officer may be liable for civil damages for an arrest if no reasonable competent officer would conclude that probable cause exists." *Wilson*, 212 F.3d at 786. If reasonably competent officers could disagree, then an officer is immune from suit. *Id.* These observations stem from the teachings of the Supreme Court emphasizing that before there can be civil rights liability where the doctrine of qualified immunity has been invoked, the " 'contours of the right must be

sufficiently clear,' " and in making this assessment

> [t]he relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.... If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.

*Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

In the present case, it is not clear that "no reasonable competent officer" would conclude that probable cause exists. Contrary to Plaintiff's contentions, the Affidavit, either in the original final draft or the "corrected" version, does not appear to be "so lacking in indicia of probable cause as to render official belief in its existence unreasonable." *See id.* at 345-46. As explained above, the Affidavit contained ample core facts and circumstances from which a judicial officer could conclude that there was a fair probability that Plaintiff committed the crimes of giving a false report and theft of property. And the additional facts known to Detective Evanson at the time merely provided additional grounds to support a reasonable belief that the totality of the circumstances created probable cause for Plaintiff's arrest.

As previously noted, the qualified immunity doctrine "gives ample room for mistaken judgments" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). And even if it is true that officers of reasonable competence could disagree as to whether there was probable cause based on either the final or "corrected" version of the Affidavit, disagreement among officers of reasonable competence is not enough to remove the cloak of immunity. *See Malley*, 475 U.S. at 341.

Here, at the very best, reasonable competent officers confronted with the acquisition of a warrant based on the core facts in the Affidavit and viewing the additional facts known to Detective Evanson objectively could reasonably disagree as to whether probable cause existed for Plaintiff's arrest. Consequently, even drawing all inferences in a light most favorable to Plaintiff, a jury could not conclude that no reasonable competent officer would fine probable

cause in this instance.  Thus, Detective Evanson's qualified immunity defense must be upheld.[9]

### C.      Plaintiff's Unlawful Search Claim regarding Blood Sample

Plaintiff claims Detective Evanson conducted an unreasonable search under the Fourth Amendment by ordering a toxicology screen on a blood sample taken from her on the night of the incident.  (doc. no. 103 at 26-27).  She points to the form marked "Passavant Hospital Authorization for Collection and Release of Evidence and Information," signed that night, which permitted "Dr. Jones, M.D., his medical and nursing assistants and associates to conduct an examination to collect evidence concerning an alleged sexual assault."  (doc. no. 98, exh. L). Plaintiff asserts this form did not authorize Detective Evanson to request the hospital to test her

_____

[9]Plaintiff's contention that Detective Evanson's failure to include information surrounding the Landmark Attack would have negated probable cause cannot stand.  Plaintiff bases this contention on Detective Evanson's failure to connect the two attacks.  (*See* doc. no. 103 at 23).  As previously noted, Plaintiff intends to offer expert testimony from Corporal Cronin of the Pennsylvania State Police that these similarities are relevant and "fairly obvious, " and that he would expect a detective who was investigating both of these cases to recognize these similarities.  (*Id.*).  However, while a police officer cannot simply ignore or omit exculpatory evidence in an affidavit of probable cause, *Wilson*, 212 F.3d at 790, "[o]nce a police officer has discovered sufficient facts to establish probable cause, the officer has no constitutional duty to further investigate in hopes of finding exculpatory evidence."  *Patterson v. Sch. Dist. Of Phila*, Civ. A. No. 99-4792, 2000 U.S. Dist. LEXIS 10245, at *6 (E.D. Pa. July 19, 2000).  Because the circumstances when viewed objectively supported the view that Detective Evanson reasonably could have believed he had probable cause indicating Plaintiff filed a false police report and been involved in taking money from the Gulf station, he did not need to expend additional effort connecting these two incidents.

It is true that Detective Evanson could have done a more thorough investigation surrounding Plaintiff's case and perhaps should have connected the Landmark Attack with Plaintiff's robbery and assault.  But to the extent that Plaintiff is arguing that Detective Evanson was negligent in his investigation, negligent conduct alone "provides an insufficient bases on which to find a [Fourth Amendment] violation."  *Barton v. Curtis*, Civ. A. No. 2005-2, 2008 U.S. Dist. LEXIS 96855, at *33 (D. V.I. Nov. 25, 2008) (citing *Miller v. Prince George's County*, 475 F.3d 621, 627-28 (4th Cir. 2007) ("A plaintiff's 'allegations of negligence or innocent mistake' by a police officer will not provide a basis for a constitutional violation.") (quoting *Franks*, 438 U.S. at 171)).  Similarly, negligence by a public official is not actionable as a violation of the Due Process Clause.  *See Orsatti*, 71 F.3d at 484.  Therefore, Plaintiff's claims fail to the extent she argues that her constitutional rights were violated by negligence on the part of Detective Evanson in his investigation.

blood for drugs.  Plaintiff also points to a Health Information Portability and Accountability Act ("HIPAA") form (doc. no. 98, exh. M), executed on September 24, 2004, which she claims only authorized Detective Evanson to deliver her medical records to her worker's compensation attorney.  These forms purportedly fall short of permitting Detective Evanson to subject her blood to a toxicology screening.

Obtaining physical evidence from a person "implicates a Fourth Amendment right only when 'the bodily seizure requires production of evidence below the body surface which is not subject to public view.'" *Williams v. Lancaster*, 639 S. Supp. 377, 382 (E.D. Pa. 1986) (citing *In re Grand Jury Proceedings*, 686 F.2d 135, 139 (3d Cir. 1982) (upholding compelled production of hair samples)).  The Supreme Court has prohibited forced invasions below the body surface, such as blood samples, *Schmerber v. California*, 384 U.S. 757 (1966), and fingernail scrapings, *Cupp v. Murphy*, 412 U.S. 291 (1973).  But it also has held that the Fourth Amendment "provides no protection for what a person knowingly exposes to the public."  *United States v. Dionisio*, 410 U.S. 1, 14 (1973) (permitting voice exemplars).

Plaintiff is not challenging the actual drawing of hre blood; her contention is limited to Detective Evanson's request for a toxicology screening from blood that was drawn with her consent.  The Authorization for Collection and Release of Evidence and Information states:

> I, Sara Reedy, freely consent to allow Dr. Jones, M.D., his medical and nursing assistants and associates to conduct an examination to collect evidence concerning an alleged sexual assault.  This procedure has been fully explained to me and I understand that this examination will include tests for the presence of sperm and sexually transmitted diseases, infections diseases, as well as clinical observation for physical evidence of penetration of or injury to my person, or both, and the collection of other specimens and blood samples for laboratory analysis.
>
> I fully understand the nature of the examination and the fact that medical information gathered by this means may be used as evidence in a court of law or in connection with enforcement of public health rules and law.
>
> I do . . . authorize the hospital and its agents to release the laboratory specimens, medical records and related information pertinent to this incident, including any photographs, to the appropriate law enforcement officials, and I herewith release and hold harmless the hospital and its agents from any and all liability and claims of injury whatsoever which may in any manner result

from the authorized release of such information.

(doc. no. 98, exh. L).  By signing this agreement, Plaintiff consented to have her blood drawn.

Once drawn, Plaintiff lost any reasonable expectation of privacy in that blood because any

subsequent testing did  not involve an intrusion below the bodily surface.  *See Williams*, 639 F.

Supp. at 382 (holding that a black light examination for hair was not an unreasonable search, even

though the ultraviolet light disclosed traces invisible to the public, because it did not involve an

intrusion below the bodily surface).  Furthermore, any type of toxicology screening would fall

within the scope of the authorization, which included "the collection of other specimens and blood

samples for laboratory analysis."  Thus, she released any reasonable expectation of privacy in the

content of her blood and Detective Evanson's ordering of a toxicology screening could not have

violated her Fourth Amendment rights.

Moreover, Plaintiff has not pointed to any evidence suggesting  that Detective Evanson did

not also request the screening as part of his investigation into the alleged robbery and sexual

assault.  Although Plaintiff may not agree, a negative screening may well have assuaged his belief

that Plaintiff was implicated in the reported theft.  Thus, the testing falls squarely within the

perimeters of the consent voluntarily given.  For these reasons, Detective Evanson did not conduct

an unreasonable search under the Fourth Amendment.

### D.     Plaintiff's Claims as to Mannell and Meyer

Plaintiff claims that Public Safety Director Mannell participated in the investigation of

Plaintiff in a way that violated her Fourth and Fourteenth Amendment rights, and also claims that

Detective Meyer deprived her of liberty without due process of law under the Fourteenth

Amendment.  As discussed above, however, Detective Evanson established probable cause

through the Affidavit, thereby precluding a determination that  Mannell and Meyer engaged in

conduct which amounted to a constitutional violation.  Furthermore, in an opinion issued on

August 9, 2008 (Doc. No. 55), this court made clear the elements Plaintiff had to satisfy in

establishing liability against Mannell.  Plaintiff's submissions fall woefully short of presenting

sufficient evidence to meet those elements.  Similarly, Plaintiff is unable to point to anything that

Detective Meyer did beyond accompanying Detective Evanson during his encounters with Plaintiff. Accordingly, he is entitled to the same qualified immunity that extends to Detective Evanson; and Safety Director Mannell is entitled to summary judgment for this reason as well as Plaintiff's failure to meet the standards needed to impose liability under *Monell v. Dep't of Social Services*, 436 U.S. 658 (1978).

### D.    Intentional Infliction of Emotional Distress

Plaintiff brings a claim of intentional infliction of emotional distress, asserting that Detectives Evanson and Meyer's conduct prior and subsequent to her arrest was "extreme and outrageous." (doc. no. 103 at 33). To sustain a claim for intentional infliction of emotional distress, a plaintiff must show "extreme and outrageous conduct which is deliberate and which causes severe emotional distress." *McClain v. Munn*, Civ. A. No. 06-278, 2008 U.S. Dist. LEXIS 28985, at 13-17 (W.D. Pa. April 9, 2008) (citing *Kazatsky v. King David Memorial Park, Inc.*, 527 A.2d 988 (Pa. 1987)). The conduct complained of must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* (citing *Kazatsky*, 527 A.2d at 991).

Plaintiff cites to no authority to support her contention that the conduct of Detectives Evanson and Meyer was "extreme and outrageous." To begin, there is no evidence that they acted with an improper motive or purpose. Any reading of the record is limited to the basic proposition that they were acting to solve crimes that had been committed within their jurisdiction. They harbored neither an improper motive nor a nefarious agenda. Thus, their conduct is nothing more than inaccurate or over zealous police work at best.

And even when Plaintiff's accusations of misrepresentation and omissions are taken into account, the arresting and imprisoning of Plaintiff does not rise to the level of conduct that is so outrageous in character, or so extreme in degree, as to support a claim for intentional infliction of emotional distress. This proposition is well established. For example, in *Gilbert v. Field*, 842 F. Supp. 803, 821 (E.D. Pa.1993), claims that a county detective instituted plaintiff's arrest without probable cause, arrested him in front of his grandmother, placed him in handcuffs and made him

37

walk five or six blocks, transferred him to another jail without instructions to do so, detained him for several hours before his arraignment, persuaded him to waive his arraignment in Philadelphia until he was transferred to Montgomery County, re-arrested him without probable cause, and signed an affidavit of probable cause despite knowing it was false was held not to be so outrageous as to constitute a claim for intentional infliction for emotional distress. Additionally, in *Sieger v. Township of Tinicum*, Civ. A. No. 89-5236, 1991 U.S. Dist. LEXIS 13176, at *5 (E.D. Pa. Sept. 30, 1991), claims that a township executive official knowingly issued a series of citations without probable cause and testified falsely at a hearing on the citations were deemed not to rise to the requisite level of outrageousness.

In short, Detectives Evanson and Meyer conducted an investigation of Plaintiff's case and during that investigation developed a theory that she falsified her police report and was involved with the theft of the money taken from J&G Gulf. While they may have botched the investigation, been unkind to Plaintiff and even harassed her during this investigation, such conduct does not rise to the requisite level of outrageousness. Consequently, summary judgment must be granted on this claim as well.

## VI.     CONCLUSION

For the foregoing reasons, no reasonable jury could conclude that (1) the Affidavit, as corrected, did not establish probable cause, (2) Detective Evanson did not have probable cause to arrest Plaintiff, and (3) that no reasonable officer could believe objectively under the known facts and circumstances that probable cause did not exist to arrest Plaintiff on the charges of making a false report and theft of property. These shortcomings extend to Public Safety Director Mannell and Detective Meyer. Plaintiff has failed to establish the elements necessary to impose liability under *Monell* against Safety Director Mannell. In addition, no reasonable jury could conclude that Detective Evanson conducted an unreasonable search of Plaintiff's blood under the Fourth Amendment or that defendants' conduct was extreme and outrageous. Therefore, Defendants'

Motion for Summary Judgement properly was granted.


Date: April 20, 2009

                                        s/ David Stewart Cercone
_____    David Stewart Cercone
                                        United States District Judge



cc:     David C. Weicht, Esquire
        Andrew Blattenberger, Esquire
        Leech, Tishman, Fuscaldo & Lampl
        Citizens Bank Building
        525 William Penn Place
        30th Floor
        Pittsburgh, PA 15219

        Scott G. Dunlop, Esquire
        Paul D. Krepps, Esquire
        Marshall Dennehey Warner
            Coleman & Goggin
        Suite 2900, U.S. Steel Tower
        600 Grant Street
        Pittsburgh, PA 15219